IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

MICHAEL MANSFIELD,               )
                                 )
                Plaintiff,       )
                                 )
       v.                        )    Case No.
                                 )    05-0808-CV-W-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,              )
                                 )
                Defendant.       )

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael Mansfield seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Title
II of the Social Security Act ("the Act"). Plaintiff argues
that the ALJ erred (1) in finding plaintiff's mental
impairments were not severe; (2) in not giving controlling
weight to the opinion of plaintiff's treating physician, Dr.
Zink, a cardiologist; and (3) in providing a faulty
hypothetical question to the vocational expert resulting in
a finding that plaintiff can return to his past relevant
work. I find that the ALJ erred in failing to give
controlling weight to the opinion of plaintiff's treating
cardiologist, and that the substantial evidence in the
record as a whole does not support the ALJ's opinion that
plaintiff's disability ended on March 1, 2004. Therefore,

plaintiff's motion for summary judgment will be granted and the decision of the Commissioner will be reversed.

## I.   BACKGROUND

On February 20, 2003, plaintiff applied for disability benefits alleging that he had been disabled since February 9, 2003.  Plaintiff's disability stems from a heart attack with open heart/by-pass surgery.  Plaintiff's application was denied on May 28, 2003.  On November 22, 2004, a hearing was held before Administrative Law Judge Gary Lowe.  On December 14, 2004, the ALJ found that plaintiff was disabled from February 9, 2003, through February 28, 2004, but not thereafter.  On June 30, 2005, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997);

2

Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

3

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff; medical experts Richard Kaspar, Ph.D., and Lawrence Campodonico, M.D.; and vocational expert George Robert McClellan, in addition to documentary evidence admitted at the hearing.

5

## A.   *EARNINGS RECORD*

The record establishes that plaintiff earned the following income from 1965 through 2004:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1965 | $      60.00 | 1985 | $ 16,734.60 |
| 1966 | 745.98 | 1986 | 17,262.69 |
| 1967 | 473.70 | 1987 | 17,892.00 |
| 1968 | 878.74 | 1988 | 20,531.22 |
| 1969 | 2,088.95 | 1989 | 21,486.40 |
| 1970 | 4,461.42 | 1990 | 23,360.07 |
| 1971 | 7,800.00 | 1991 | 21,309.00 |
| 1972 | 5,696.07 | 1992 | 2,546.40 |
| 1973 | 4,586.66 | 1993 | 763.42 |
| 1974 | 5,540.76 | 1994 | 11,774.08 |
| 1975 | 6,417.90 | 1995 | 2,993.93 |
| 1976 | 7,117.74 | 1996 | 13,413.93 |
| 1977 | 7,628.54 | 1997 | 15,47677 |
| 1978 | 8,393.79 | 1998 | 20,116.25 |
| 1979 | 8,806.50 | 1999 | 23,728.01 |
| 1980 | 9,743.82 | 2000 | 30,594.02 |
| 1981 | 12,101.40 | 2001 | 20,496.53 |
| 1982 | 14,271.63 | 2002 | 21,511.21 |
| 1983 | 14,878.80 | 2003 | 629.00 |
| 1984 | 15,768.87 | 2004 | 0.00 |

(Tr. at 82-87).

6

**B.    SUMMARY OF MEDICAL RECORDS**

On April 12, 2002, plaintiff was seen at the Pleasant Hill Medical Clinic for left foot pain and swelling (Tr. at 224).  Plaintiff denied any known injury but stated he was working 12 to 16 hour days on a concrete floor and was on his feet the entire day.  The doctor recommended ice, elevation, and Tylenol and discussed lifestyle changes to decrease plaintiff's blood pressure.

On April 22, 2002, plaintiff was seen at the Pleasant Hill Medical Clinic for left foot pain (Tr. at 223).  Plaintiff was instructed to take Tylenol as needed and obtain an x-ray at Cass Medical Center.

On February 9, 2003, plaintiff's alleged onset date, plaintiff went to the emergency room at the Cass Medical Center in Harrisonville with chest and shoulder pain and shortness of breath (Tr. at 157-166).  Plaintiff was listed as a smoker, and was on no medications (Tr. at 157).  His mother had died at age 45 from a heart attack, and his father had died at age 58 from complications from diabetes (Tr. at 182).  Plaintiff was transferred to St. Luke's, where Michael Borkon, M.D., performed an emergency coronary

7

artery bypass grafting[1] times one and repair of VSD[2] (Tr. at

170, 184-185).  Plaintiff actually had severe coronary

artery disease in three vessels, but only underwent one

bypass because the other two had already infarcted[3] (Tr. at

324).

On February 12, 2003, he had an ejection fraction[4] of

---

[1]Coronary arteries supply the heart with oxygen-rich
blood. Coronary artery bypass grafting is performed for
patients who have narrowings or blockages of the coronary
arteries. The blockages or narrowings of the coronary
arteries is known as coronary artery disease and is
secondary to a disease process known as arteriosclerosis,
commonly referred to as "hardening of the arteries".  In
performing a coronary artery bypass, the surgeon utilizes a
piece of vein from the patient's leg or an artery located on
the inside of the chest to create an alternative pathway for
the oxygen-rich blood to enter the narrowed or blocked
artery so that this blood can reach the heart muscle. Hence
the name coronary artery bypass. The new graft helps blood
"bypass" the narrowing or blockage.

[2]A Ventricular Septal Defect is a hole in the septum
(the wall) between the lower chambers of the heart (the
ventricles).

[3]Pathological death of the cells due to sudden
insufficiency of blood supply.

[4]Ejection fraction is the fraction of blood pumped out
of a ventricle with each heart beat. The term ejection
fraction applies to both the right and left ventricles; one
can speak equally of the left ventricular ejection fraction
(LVEF) and the right ventricular ejection fraction (RVEF).
Without a qualifier, the term ejection fraction refers
specifically to that of the left ventricle. Healthy
individuals typically have ejection fractions greater than
55%. However, normal values depend upon the modality being
used to calculate the ejection fraction. Damage to the

8

30% (Tr. at 171).  Plaintiff had had a substantial heart

attack but had a peak troponin[5] of only 20, suggesting this

was more of a chronic process.  He was discharged on

February 14, 2003, with a discharge diagnosis of coronary

artery disease, VSD [see footnote 2], acute myocardial

infarction [heart attack], acute pericarditis[6], hypotension

[abnormally low blood pressure], hypertension [high blood

pressure], degenerative joint disease, and tobacco abuse

(Tr. at 170).  He was told to eat a low cholesterol diet and

---

muscle of the heart (myocardium), such as that sustained
during myocardial infarction or in cardiomyopathy, impairs
the heart's ability to eject blood and therefore reduces
ejection fraction. This reduction in the ejection fraction
can manifest itself clinically as heart failure. The
ejection fraction is one of the most important predictors of
prognosis; those with significantly reduced ejection
fractions typically have a poorer prognoses.

[5]Troponin is a protein complex that confers calcium
sensitivity to muscle cells.  Certain subtypes of troponin
are very sensitive and specific indicators of damage to the
heart muscle (myocardium). They are measured in the blood to
differentiate between unstable angina and myocardial
infarction (heart attack) in patients with chest pain. A
patient who had suffered from a myocardial infarction would
have an area of damaged heart muscle and so would have
elevated cardiac troponin levels in the blood.  There is no
standard reference range for troponin as myriad factors must
be considered in determining whether it is in or out of
range for any specific person.

[6]Pericarditis is a disorder caused by inflammation of
the pericardium, which is the sac-like covering of the
heart.

do no heavy lifting (Tr. at 170).

On February 21, 2003, plaintiff was seen at the Pleasant Hill Medical Center for a follow up (Tr. at 222). Plaintiff denied any chest pain or shortness of breath. He had blood drawn for a pro-time test[7].

On March 3, 2003, plaintiff was seen at the Pleasant Hill Medical Center for a follow up (Tr. at 221). He had blood drawn for a pro-time test. He complained of having no energy and being fatigued. Plaintiff had quit smoking since his surgery. Plaintiff's wife complained that plaintiff had shortness of breath, especially with activity. Plaintiff was continued on his medications.

On March 7, 2003, plaintiff had a cardiac rehabilitation admission assessment (Tr. at 279-281). Plaintiff stated he quit smoking on February 9, 2003. Plaintiff's range of motion in his left shoulder was decreased. Plaintiff exercised for a total of 31 minutes. His maximum heart rate was 88.

From March 12, 2003, through April 30, 2003, plaintiff attended cardiac rehabilitation (Tr. at 234, 237, 240, 243,

_____

[7]The prothrombin time test belongs to a group of blood tests that assess the clotting ability of blood. The test is also known as the pro time or PT test.

10

246, 249, 252, 253, 256, 259, 262, 265, 268, 271, 274, 277).

On March 27, 2003, plaintiff saw Tony Zink, M.D., Ph.D., a cardiologist, for a follow up (Tr. at 302-303). "Since his discharge from St. Luke's on 2/14/03, he has done very well. He is finishing his third week of cardiac rehab without any difficulties. He denies any tachypalpitations[8], presyncope [lightheadedness or dizziness] or syncopal episodes [fainting]. He denies any heart failure, recurrent indigestion or angina [chest pain]. He has some mild complaints about the musculoskeletal discomfort of his median sternotomy but, overall, his symptoms are surprisingly minimal. . . .

"Social History: He is married, the father of five children. He works primarily as a human resources administrator but he is not employed at this point. Unfortunately, he still smokes about one-half pack of cigarettes per day.

"Physical Exam: . . . . Normal regular first and second heart tones. No gallops were noted. He did have a

_____

[8]A pounding sensation of the heart at more than 100 beats per minute.

11

2/6 systolic outflow murmur[9] that did not sound to be VSD [Ventricular Septal Defect, a hole in the wall between the lower chambers of the heart].

"Electrocardiogram: 3/27/03: Sinus rhythm with very poor R wave progression and transition in V6[10] and deep symmetric T wave inversion[11] throughout this precordium [the

---

[9]A murmur is a vague sound associated with turbulent blood flow through a heart valve.

[10]During an EKG, six leads are attached to the chest. The zig-zag like marks that represent heart beats consist of, among others, Q (which is the short down stroke), followed by R (which is the very tall stroke), followed by S (which is the down stroke usually a bit lower than Q). The waves are measured from V1 through V6 (i.e., lead one through lead six). The normal progression is that the S wave is greater than the R wave at V1, and the R wave is greater than the S wave at V6. The transition usually occurs around V3-V4. Normally the R wave becomes progressively taller as one moves across the precordial leads. Poor R wave progression means that the R wave is not becoming bigger across the leads. Poor R wave progression can be caused by LVH [left ventricular hypertrophy, or enlarged walls of the left ventricle], RVH [right ventricular hypertrophy], pulmonary disease, anterior or anteroseptal infarction, conduction defects, or cardiomyopathy [weakening of the heart muscle].

[11]The T wave is the part of the EKG measurement that occurs after the QRS described in footnote 10. An inverted T wave can indicate ischemia [restriction in blood supply, generally due to factors in the blood vessels, with resultant damage or dysfunction of tissue], myocardial infarction [heart attack], pericarditis [inflammation of the pericardium], or LVH [left ventricular hypertrophy -- the walls of the ventricle can be measured and a thickness of greater than 1.5 cm is considered enlarged.]

portion of the body over the heart and stomach] and minimal S-T elevation inferiorly." Dr. Zink's impression was severe ischemic cardiomyopathy [congestive heart failure due to coronary artery disease], status post myocardial infarction [after having had a heart attack], probably remote to his initial presentation and then with recurrent infarction resulting in his ventricular septal defect [a hole in the wall between the lower chambers of the heart], now status post one vessel CABG [coronary artery bypass grafting, see footnote 1] and repair. "Given the severity of his ischemic heart disease and VSD [ventricular septal defect], I would consider him rather disabled. He will be re-evaluated after he has completed cardiac rehab."

On April 2, 2003, plaintiff was seen at the Pleasant Hill Medical Center for a follow up (Tr. at 220). He indicated he had resumed smoking and was smoking about four cigarettes per day. The doctor strongly encouraged him to stop smoking. Plaintiff said he had not been able to do as much as he would like, but stated that he was doing well according to the nurse at cardiac rehabilitation. Plaintiff had blood drawn for a pro-time test. He was continued on his medications.

13

On April 7, 2003, plaintiff was seen at the Pleasant Hill Medical Center (Tr. at 219). Plaintiff complained that he moved some toy boxes that weighed about 20 pounds each on Friday, April 4, and began to have chest pain, a sudden sharp onset which then eased with rest. The pain was about an 8 1/2 on a scale of one to ten, then eased to a one with rest. The pain was worse with activity and when lying on his left side. After an exam, Dr. Henry assessed atypical chest pain "most likely . . . chest wall musculoskeletal type pain." Plaintiff was told to avoid activities that aggravate his pain, such as lifting overhead.

On April 11, 2003, plaintiff saw A. Michael Borkon, M.D., a cardiologist at St. Luke's, for a follow up (Tr. at 214). Dr. Borkon noted that plaintiff's recovery was "wonderful". His wounds had healed, and his sternum was stable.

On April 29, 2003, plaintiff was seen at the Pleasant Hill Medical Center for a cardiology consult (Tr. at 218). His Toprol XL[12] was increased by 25 mg.

---

[12]A beta blocker used to reduce hypertension (high blood pressure), to treat chest pain (angina), to treat heart failure, and to reduce the risk that a heart attack will recur.

On May 22, 2003, Tim Link, M.D., wrote a "report of contact" to Dr. Zink (Tr. at 300) which states as follows: Thank you for speaking with me about this patient. Your comments are helpful in making decisions about their [sic] disability application. . . . Please review the following summary of our conversation for accuracy and feel free to make any corrections/additions."

> Considering his ischemic cardiomyopathy and S/P CABG [status post coronary artery bypass grafting], this patient would be expected to be capable of full-time sedentary work (sitting 6 hours per shift; standing/walking 15 minutes at a time for a total of 2 hours per shift; lifting/carrying 10# occasionally and <10# frequently) by 2/04.

The form is signed by Dr. Zink and dated May 27, 2003 (Tr. at 300).

On June 24, 2003, plaintiff saw cardiologist Tony Zink, M.D., Ph.D., at Cardiovascular Consultants, for a follow up (Tr. at 298-299). Plaintiff was still unable to mow the lawn "without breathing really hard due to his chronic dyspnea [shortness of breath] on exertion which he was able to do before his heart attack." Plaintiff continued to have some positional musculoskeletal discomfort in his left chest and continued left shoulder discomfort.

15

"Cardiac exam revealed normal first and second heart tones with a 2/6 systolic outflow murmur[13] and an intermittent S3[14]."  Dr. Zink's impression was severe ischemic cardiomyopathy [congestive heart failure due to coronary artery disease], status post acute anterior and inferior myocardial infarction [heart attack] remote to his initial presentation.  Now status post a ventricular septal defect [hole in the wall between the lower chambers of the heart] repair with a large anterial wall that is non-viable.  Plan:  "I have asked him to maintain his Toprol at 25 mg q.d. [once a day], increase his Altace[15] to 5 mg q.d., and

---

[13]A murmur is a vague sound associated with turbulent blood flow through a heart valve.

[14]During diastole (the heart's relaxation phase), there are two sounds of ventricular filling:  The first is from the atrial walls and the second is from the contraction of the atriums.  The third heart sound is caused by vibration of the ventricular walls, resulting from the first rapid filling so it is heard just after S2 (the second heart sound).  The third heart sound is low in frequency and intensity. While it may be heard normally in people under 40 years old, its presence beyond this age usually means a heart problem.  It is common to hear an S3 after an acute heart attack.  This usually disappears several days or weeks afterward.  A persistent S3 after heart attack indicates a poor prognosis. Nirmal Joshi, M.D., Milton S. Hershey Medical Center, Pennsylvania State University, South Med J. 92(8): 756-761, 1999; http://www.cs.yale.edu/homes/reyzin/ IWSpring2004/info/S3.txt.

[15]An ACE inhibitor used to treat hypertension (high blood pressure), to prevent heart failure following a heart

come back [and] see me in about six months.  At that time I
will have him undergo an echocardiogram and probably
increase his Toprol again to 25 mg b.i.d. [twice a day],
which he did not seem to tolerate the first time.
Additionally, given the severity of his ischemic
cardiomyopathy [congestive heart failure due to coronary
artery disease] and limited chances of improvement given the
large area of non-viable myocardium [heart muscle] at the
time of his bypass surgery, he would certainly qualify for
cardiac disability given his current medical limitations."

Sometime during the second half of 2003[16], Tony Zink,
M.D., plaintiff's cardiologist, completed a Cardiac Residual
Functional Capacity Questionnaire (Tr. at 204-213).  Dr.

---

attack, and to reduce the risk of heart attack, stroke, and
death in patients who are at an increased risk for these
problems.

[16]The form is undated, and it contains the following
written statement by Dr. Zink:  "Patient was first seen
2/9/03, most recent ov [office visit] was 6/24/03.  He is
due for a flu appt in December."  Therefore, it appears this
form was completed sometime after June 24, 2003, and
sometime before December 2003.  The table of contents to the
administrative record lists this as a form completed on
February 17, 2003, which clearly cannot be the case,
although that date appears by the doctor's signature.  The
ALJ also refers to this form as having been completed on
February 17, 2003 (Tr. at 16).

Zink diagnosed plaintiff with Ischemic Cardiomyopathy[17] with an ejection fraction of 30%; coronary artery disease status post coronary artery bypass grafting 2/9/03; dyslipidemia[18]; status post acute myocardial infarction [heart attack]; Ventricular Septal Defect [hole in the wall between the lower chambers of the heart], status post closure 2/03. The clinical findings, and laboratory and test results supporting the impairments included echocardiogram in February 2003; ejection fraction of 30%; cardiac catheterization 2/9/03 – Ventricular Septal Defect; occluded [blocked] right coronary artery; coronary artery bypass grafting with ventricular septal defect repair, peak troponin 2/03 of 20; along with several illegible entries. Plaintiff's symptoms were listed as shortness of breath and fatigue. The form asks if plaintiff is a malingerer, and Dr. Zink circled "no". Dr. Zink noted that plaintiff has "marked limitation of physical activity as demonstrated by

---

[17]In Ischemic Cardiomyopathy, the heart's ability to pump blood is decreased because the heart's main pumping chamber, the left ventricle, is enlarged, dilated and weak. This is caused by ischemia – a lack of blood supply to the heart muscle caused by coronary artery disease and heart attacks.

[18]Dyslipidemia is a disruption in the amount of lipids (fat) in the blood.

fatigue, palpitation, dyspnea [shortness of breath], or anginal discomfort on ordinary physical activity" even though comfortable at rest.  He wrote that stress can precipitate plaintiff's symptoms.  The form asks "To what degree can your patient tolerate work stress?" and Dr. Zink circled "Capable of low stress jobs".

In explaining the reasons for his conclusion, Dr. Zink wrote, "EF [ejection fraction] < 30%, + large amount of nonviable myocardium [dead cardiac muscle] that will never improve."

Dr. Zink noted that plaintiff has not shown any signs of depression, but that emotional factors do contribute to the severity of plaintiff's subjective symptoms and functional limitations.  He wrote that plaintiff "frequently" experiences cardiac symptoms (including psychological preoccupation with his cardiac condition) severe enough to interfere with attention and concentration.

Dr. Zink wrote that plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described in Dr. Zink's evaluation.  Dr. Zink stated that plaintiff's medications result in fatigue and low blood pressure.  Prognosis was "long term survival should be good.  Significant change in functional recovery

19

from current level is limited." The impairments had lasted or were expected to last at least 12 months.

Dr. Zink found that plaintiff could sit for more than two hours at a time, stand for one hour at a time, frequently lift less than ten pounds, and occasionally lift ten pounds. Plaintiff's impairments are likely to produce good days and bad days and result in one day of missed work per month.

On the same day, Dr. Zink completed a Cardiac Impairment Questionnaire (Tr. at 209-213). The date of first treatment was February 9, 2003, and the date of most recent exam was June 24, 2003. The diagnosis was the same as in the Cardiac Residual Functional Capacity Questionnaire. He listed prognosis as "long term survival should be good, significant change in functional recovery from current level is limited."

The clinical findings that support the diagnosis included shortness of breath and fatigue. In addition, his myocardium was nonviable [dead heart muscle]. The laboratory and diagnostic test results were the same as those listed in the Cardiac Residual Functional Capacity Questionnaire. Plaintiff's primary symptom was chronic dyspnea [shortness of breath]. Emotional stress and

physical exertion precipitate plaintiff's cardiac
symptomatology.

When asked whether plaintiff's symptoms would likely
increase were he to be placed in a competitive work
environment, Dr. Zink answered, "yes". Dr. Zink found that
plaintiff could sit for three hours during an eight-hour
day, stand or walk for one hour during an eight-hour day,
occasionally lift 20-50 pounds, and frequently lift ten to
20 pounds. When asked how often plaintiff's pain, fatigue
and other symptoms would be severe enough to interfere with
his attention and concentration, Dr. Zink wrote,
"frequently". When asked to what degree can plaintiff could
tolerate work stress, Dr. Zink checked, "capable of low
stress".

On March 20, 2004, plaintiff participated in
psychotherapy with Cynthia Piedimonte, Ph.D. (Tr. at 315).

On March 23, 2004, a consultation note was prepared by
Dr. Piedimonte (Tr. at 316-322). Plaintiff was noted as
mildly anxious. Significant traumatic stressors were as
follows: "[A] medium scale fire fight that turned into an
18 hr fight where they overran us twice: there was a lot of
very close, hand to hand combat; you did not know who was
who. The majority of them were dressed the same as we were;

21

one of the officers got shot next to me and took the gun and
shot the Vietnamese; also one of my junior enlisted
committed suicide. . . .  The individual's response involved
intense fear, helplessness or horror -- feelings of intense
fear and helplessness, sustained life threat in heavy combat
conditions. . . .  Witnessed numerous traumatic deaths and
injuries.  Lost close friends.  Saw numerous maimed,
mutilated, burned bodies.  Re-experiencing combat-related
nightmares, intrusive memories, e.g., thick wooded area;
flashbacks, intense psychological distress at exposure to
cues; physiological reactivity on exposure to cues -- heart
racing."

Plaintiff was noted to suffer from sleep disturbance,
irritability or outbursts of anger, difficulty concentrating
and paying attention, hypervigilance, exaggerated startle
response.  Dr. Piedimonte concluded that the disturbance
caused clinically significant distress or impairment in
social, occupational, or other important areas of
functioning.  She found that plaintiff does meet the
criteria for post traumatic stress disorder.  "PTSD symptom
severity is likely to vacillate with fluctuations in the
severity of psychosocial stressors, particularly those
evoking feelings of helplessness and hopelessness."  Dr.

22

Piedimonte wrote, "Plan: Dr. Piedimonte will meet with pt. for individual counseling."

On May 4, 2004, Dr. Zink wrote a letter to whom it may concern (Tr. at 301). The letter states in part as follows:

The problem list includes:

1. Moderate to severe ischemic cardiomyopathy with ejection fraction approximately 30%.

   a. Admission on February 9, 2003 with reported chest discomfort at that time. Angiography demonstrated severe three-vessel disease and anteroapical ventricular septal defect.

   b. CABG at that time revealed the anterior wall was nonviable. He underwent SVG [saphenous vein graft] to his RCA [right coronary artery] and patch closure of his VSD [ventricular septal defect].

   c. Echocardiogram on February 12, 2003 revealed ejection fraction of 30%.

   d. New York Heart Association Class II to III symptoms[19] at this point despite medical therapy."

_____

[19]The New York Heart Association Functional Classification provides a simple way of classifying the extent of heart failure. It places patients in one of four categories based on how much they are limited during physical activity:
I    No symptoms and no limitation in ordinary physical

23

"He has had no change in his clinical condition in the past several months and would still qualify for disability. . . . Again, he will certainly qualify from a cardiac disability, given his heart failure and ischemic cardiomyopathy with reduced ejection fraction and limiting chances of recovery."

On June 30, 2004, the Department of Veterans Affairs awarded plaintiff benefits resulting from his post traumatic stress disorder (Tr. at 308-314). The decision reads in part as follows: "You are noted to have longstanding and predominant avoidance symptoms, including efforts to avoid thoughts, conversations, and settings or situations that would arouse recollections of your combat experiences. . . . Since starting psychotherapy, you have also experienced recurrent and intrusive memories associated with your combat experiences. Other post traumatic stress disorder symptoms include psychological distress and physiological reactivity on exposure to stimuli associated with your combat trauma,

---

activity.
II   Mild symptoms and slight limitation during ordinary activity.  Comfortable at rest.
III  Marked limitation in activity due to symptoms, even during less-than-ordinary activity.  Comfortable only at rest.
IV   Severe limitations. Experiences symptoms even while at rest.

24

social detachment, restricted range of affect, sleep disturbance, irritability and anger outbursts several times per week, concentration difficulty, hypervigilance, and exaggerated startle response.

"The examiner assigned a Global Assessment of Functioning (GAF) of 55 which, according to the Diagnostic and Statistical Manual of Mental disorders Volume IV, is afforded individuals who had moderate symptoms or moderate difficulty in social, occupational or school functioning. This finding, along with your symptomatology, approximates the criteria outlined above for a 30 percent evaluation. An evaluation of 30 percent is granted whenever there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). . . ."

On October 14, 2004, Dr. Zink wrote a letter to whom it may concern (Tr. at 328). The letter states in part as follows:

The problem list includes:

1.  Moderate to severe ischemic cardiomyopathy with ejection fraction approximately 30%.

a.  Admission on February 9, 2003 with reported chest discomfort at that time. Angiography demonstrated severe three-vessel disease and anteroapical ventricular septal defect.

b.  CABG at that time revealed the anterior wall was nonviable.  He underwent SVG [saphenous vein graft] to his RCA [right coronary artery] and patch closure of his VSD [ventricular septal defect].

c.  Echocardiogram on February 12, 2003, revealed ejection fraction of 30%.

d. New York Heart Association Class II to III symptoms [see footnote 19] at this point despite medical therapy.

"He has had no change in his clinical condition in the past several months and would still qualify for disability. . . .  Again, he will certainly qualify from a cardiac disability, given his heart failure and ischemic cardiomyopathy with reduced ejection fraction and limiting chances of recovery."

26

*C.*   *SUMMARY OF TESTIMONY*

During the November 22, 2004, hearing, plaintiff testified; Richard Kaspar, Ph.D., and Lawrence Campodonico, M.D., testified as medical experts; and George Robert McClellan, a vocational expert, testified at the request of the ALJ.

**1.  Plaintiff's testimony.**

At the time of the administrative hearing, plaintiff was 55 years of age and is currently 57 (Tr. at 332-333). He is 5' 9" tall and weighs about 175 pounds (Tr. at 333). Plaintiff is married and has three children living at home -- ages 12, 9, and 7 (Tr. at 334).  Plaintiff's wife cleans houses for a living (Tr. at 334).  Plaintiff receives $1,000.00 per month military disability for his post traumatic stress disorder and degenerative joint disease which are service-connected disabilities (Tr. at 352-353). Plaintiff is currently receiving $234.00 per month in military retirement in addition to the VA disability pension (Tr. at 353-354).

Plaintiff last worked as a regional manager for a temporary staffing firm in Independence, Missouri (Tr. at 334).  He had that job for three days before he suffered a heart attack (Tr. at 334).  His last day of work was a day

27

and a half before his heart attack (Tr. at 334).  Plaintiff
did not have any physical stress during his job as a
regional manager (Tr. at 336).  In previous similar jobs,
plaintiff was required to drive a lot, from 75 to 200 miles
per trip, approximately 20 days per month (Tr. at 337-338).
He also had to move groups of files from one location to
another (Tr. at 337-338).  Those files weighed about ten
pounds (Tr. at 337).  Plaintiff spent about half his time on
his feet and the other half sitting down (Tr. at 337-338).

Plaintiff did not know that he had had a heart attack
(Tr. at 335).  Plaintiff's wife took him to the emergency
room, he was hospitalized, and he eventually underwent
emergency bypass surgery (Tr. at 335).  Plaintiff then went
through cardiac rehab (Tr. at 335).

Plaintiff's cardiologist, Dr. Zink, has told plaintiff
not to return to work (Tr. at 335).  Dr. Zink feels that the
constant activity and stress from working would cause
another heart attack (Tr. at 335-336).

Plaintiff is right-handed (Tr. at 333).  He has no
problems with his right hand, but he has very limited use of
his left hand (Tr. at 333-334).

Plaintiff drove to the administrative hearing (Tr. at
338).  He has to watch his limitations, because his feet go

28

numb very quickly (Tr. at 339).  During the 45-minute trip
to the hearing, plaintiff stopped once to stretch his legs
(Tr. at 339).  Plaintiff's left foot goes numb more than his
right foot (Tr. at 339).

Plaintiff typically gets up and gets his kids up, gets
their breakfast, makes sure they have their schoolbooks, and
gets them "out to school" (Tr. at 340).  He can do laundry,
load the dishwasher, feed the dogs, shop for groceries (Tr.
at 340, 342).  He cannot sweep or mop because of fatiguing
pain in his chest (Tr. at 340).  When that happens, he sits
down and relaxes for about 25 minutes (Tr. at 340).
Plaintiff has chest pain almost every day (Tr. at 340-341).
If he has to stretch or yawn, he feels the stress in his
chest (Tr. at 341).

Plaintiff attends his kids' school activities including
plays and his daughter's basketball games (Tr. at 342).

Plaintiff believes he can sit for 25 to 30 minutes
before needing to get up and move because of lower back pain
(Tr. at 344, 345).  He had degenerative joint disease in his
back, but he is not being treated for it (Tr. at 344-345).
Plaintiff can stand for about 35 minutes at a time and walk
about a block (Tr. at 345-346).  Then he would need to stop
due to lower back pain and leg pain, left worse than right

29

(Tr. at 346).  Plaintiff believes his lifting limit is ten
pounds (Tr. at 346).

Plaintiff attended special education classes before
dropping out of school in tenth grade (Tr. at 343).  He got
a GED and attended college for a year (Tr. at 343-344).
Plaintiff was in the Marine Corps and has an honorable
discharge (Tr. at 344).

Plaintiff has not taken any nitroglycerin since his
bypass procedure (Tr. at 340).

Plaintiff is not being treated for a mental impairment,
although he attends counseling once or twice a month for
post traumatic stress disorder (Tr. at 347).  His memory is
"terrible" (Tr. at 352).  He estimates he has only 20
percent of the energy he used to have (Tr. at 354).  He is
constantly tired (Tr. at 354).  He naps two to three times a
day for an hour to an hour and a half (Tr. at 354-355).  He
sleeps for five to six hours per night, but his sleep is
restless (Tr. at 355).

Plaintiff retired from the Marine Corps in November
1991, and in 1992 when he had rather low earnings, he was
trying to find work and was going through extensive VA
disability evaluations (Tr. at 349).  In 1993 and 1994, he
was in college as a full time student and had very low

earnings as a result (Tr. at 350). Plaintiff completed a 32-credit hour course of study (Tr. at 351). Plaintiff then worked as a temporary government employee manning the front desk of a daycare on the military base (Tr. at 350). His subsequent positions were in personnel and management (Tr. at 351).

**2.  Testimony of Dr. Richard Kaspar.**

Dr. Richard Kasper, a clinical psychologist, testified as a medical expert (Tr. at 355). After reviewing the medical records, Dr. Kasper testified that there was nothing in the record indicating a memory impairment, mental confusion, or any kind of organic or cognitive dysfunction (Tr. at 357). He also failed to see any records of depression or adjustment difficulties (Tr. at 357). The records of Dr. Zink, a cardiologist, indicate that plaintiff had not shown any signs of depression (Tr. at 357). The only evidence of a mental impairment was a suggestion of post-traumatic features from extensive military service in Vietnam (Tr. at 357). This was based on a psychological screening examination done at the VA on January 23, 2004 (Tr. at 357). There is no evidence of any psychiatric care after the date of that screening examination, but the screening recommendation states "Dr. Piedimonte will meet

31

with the patient for individual counseling" (Tr. at 357-
358). There are no records to confirm the counseling
plaintiff testified about (Tr. at 358).

Based on all of the medical records, Dr. Kaspar found
mild impairments in activities of daily living, and no other
functional impairments (Tr. at 359). He would consider the
post traumatic stress disorder to be non-severe or less than
severe (Tr. at 359).

There is nothing in the record to support plaintiff's
claim of impaired memory (Tr. at 359). There are no
findings or complaints of impaired memory (Tr. at 359). Dr.
Kaspar did not count Dr. Zink's statement that plaintiff
frequently experiences cardiac symptoms severe enough to
interfere with attention and concentration because that
would not be "organic" in nature (Tr. at 360-361).

**3.    Testimony of Dr. Campodonico.**

Dr. Lawrence Campodonico, an internal medicine
specialist, testified as a medical expert (Tr. at 363). The
records reflect that plaintiff suffered a heart attack and
subsequently underwent cardiac rehabilitation (Tr. at 364).
The measured changes in that program were indicated as very
good with an improvement in his ability to perform his
activities of daily living (Tr. at 364). Plaintiff's doctor

32

noted one month postoperatively that plaintiff was "rather disabled" but did not state to what degree (Tr. at 364). That same doctor stated that plaintiff should be able to perform sedentary work by February 2004 (Tr. at 364). In June of 2003, the dame doctor stated that plaintiff was "certainly qualified for cardiac disability" but it was not substantiated by an examination (Tr. at 364-365). In that letter, the doctor was quoting from a record he had written a year earlier and did not perform a current examination (Tr. at 365).

Dr. Campodonico was unable to find anything in the record to document a disability based on cardiac problems (Tr. at 365). There is no documented symptomatology that is quantifiable, there was no post-heart attack stress test to document any evidence of continued ischemia (Tr. at 365). There was no post-surgical angiography (Tr. at 365). The evidence shows that plaintiff has a "severely impaired myocardium and myocardial function" but that is not causing him any symptomatology at the level of exercise he demonstrated in rehabilitation (Tr. at 365).

There is one mention in the records of chronic obstructive pulmonary disease presumably because of plaintiff's smoking, but there is no medical substantiation

33

(Tr. at 365).

There is nothing in the records of cardiac rehabilitation suggesting that plaintiff was impaired in his rehab program due to any problems with his skeletal system (Tr. at 366).  There is no evidence of muscular impairment secondary to peripheral neuropathy (Tr. at 366).

Based on the records and his experience, Dr. Campodonico's opinion is that plaintiff is reasonably unimpaired at some level of function as far as his ischemic heart disease is concerned (Tr. at 366-367).  Dr. Campodonico stated that plaintiff was probably disabled from February 2003 through February 2004 due to the severity of his heart condition (Tr. at 367).  However, "The fact that he continues to have an ejection fraction of 30 percent would suggest that with good medical care and on the basis of his recovery, he would be fairly stable and could conceivably led a fairly normal life for a long time, that under certain situations, excessive exertion, stressful situations, that situation could change." (Tr. at 367).  An ejection fraction of 30% means that plaintiff meets the cardiac listing 4.02(B) (Tr. at 367-368).  Although plaintiff currently has an ejection fraction of 30%, the listing requires symptomatology as well (Tr. at 373).

34

Dr. Campodonico stated that mental stress from working would not likely cause another heart attack (Tr. at 369). With respect to plaintiff's chronic fatigue and need to sleep during the day, Dr. Campodonico testified as follows:

> I have patients who have ejection fractions of 25 percent who are fully active, working full time, exercising regularly and leading a normal life. In some individuals who have ejection fractions in the range of 30 percent, fatigue is a problem related particularly to the amount of activity that they do so that if a patient is totally inactive, they may be more subject to chronic fatigue. In those individuals who are performing good exercise programs, staying in a rehab program, those symptoms begin to decline, and in a patient who has stable coronary artery disease and a stable ejection fraction, they should be able to perform.

(Tr. at 369).

In this case, the records establish that plaintiff had a remarkable recovery from a very serious heart attack, his response to cardiac rehab was excellent, and he should be able to function at some level (Tr. at 370). Dr. Campodonico testified that plaintiff should be able to sit without limitation, stand without limitation, and walk normally without limitation (Tr. at 370). He should be able to lift ten pounds off a table and carry the object about 15 feet eight to ten times per hour (Tr. at 371). He should be able to bend without limitation and occasionally climb short flights of stairs (Tr. at 371). Due to plaintiff's

35

peripheral neuropathy, he should be able to perform gross manipulative maneuvers but may have trouble with fine manipulation (Tr. at 371-372). He should avoid temperature extremes (Tr. at 372).

**4. Vocational expert testimony.**

Vocational expert George Robert McClellan testified at the request of the Administrative Law Judge. Plaintiff's past relevant sedentary work consists of a receptionist/information clerk on the military base and a nurse recruiter, also considered an employment recruiter (Tr. at 375). The receptionist job is considered low stress and the recruiter job would be moderate stress (Tr. at 375, 378). Neither job is physically stressful in nature (Tr. at 376).

The ALJ's first hypothetical involves a person who could use his upper extremities for gross manipulation without difficulty but very fine manipulation would be problematic (Tr. at 376). The person could type and write without difficulty (Tr. at 376-377). The person would have no limit on sitting, standing, or walking on level surfaces (Tr. at 377). He should avoid inclines, declines, and uneven surfaces (Tr. at 377). He could lift ten pounds maximum eight or ten times per hour, no limitation on bending at the waist, should limit his stair climbing to no

36

more than one flight occasionally (Tr. at 377). He should avoid all temperature extremes and significant emotionally stressful situations (Tr. at 377).

The vocational expert testified that such a person could perform both of plaintiff's past relevant sedentary positions -- the recruiter and the receptionist jobs (Tr. at 378).

The second hypothetical was the same as the first except the person would need to lie down a couple of times a day for 60 to 90 minutes (Tr. at 378). The vocational expert testified that such a person could not be gainfully employed (Tr. at 378).

The third hypothetical was the same as the first except the person has severe memory problems wherein 50 to 60 percent of the day he experience difficulty maintaining concentration, persistence or pace (Tr. at 378-379). The vocational expert testified that such a person could not be gainfully employed (Tr. at 379).

The plaintiff's attorney asked a hypothetical which was the same as the ALJ's first hypothetical but adding the limitation that the person would miss work more than one day per month (Tr. at 379). The vocational expert testified

37

that for a few months, employers will tolerate more than one sick day per month, but not on a normal basis (Tr. at 379).

**V.    FINDINGS OF THE ALJ**

On December 14, 2004, Administrative Law Judge Gary Lowe entered his opinion finding that plaintiff met the cardiac listing and was therefore disabled from February 9, 2003, until February 28, 2004, but was not disabled after February 28, 2004 (Tr. at 15-20).

Step one.  The ALJ found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 16).

Step two.  The ALJ found that plaintiff suffers from the following severe impairments:  ischemic heart disease, status post coronary artery bypass surgery and saphenous vein graft to his right coronary artery and patch disclosure of his ventricular septal defect, mild peripheral neuropathy and low back pain (Tr. at 17).  The ALJ found that plaintiff does not have a severe mental impairment (Tr. at 17).

Step three.  The ALJ found that plaintiff's severe impairments do not meet or equal a listed impairment after February 28, 2004 (Tr. at 17).

Step four.  The ALJ determined that plaintiff retains the residual functional capacity to sit, stand, and walk on

38

level surfaces without limitation; should avoid inclines, declines, and uneven terrains and surfaces; can lift up to ten pounds eight to ten times per hour and carry up to ten pounds for 15 feet; can bend without limitation; should only climb one flight of stairs slowly on an occasional basis; should avoid all temperature extremes; should avoid significant emotionally stressful situations; should work in a low to moderately stressful setting; may use his upper extremities for gross manipulation but would have difficulty with fine manipulation; and has mild restriction in activities of daily living (Tr. at 18-19). The ALJ found that with this residual functional capacity, plaintiff can return to his past relevant work as an employment interviewer and receptionist (Tr. at 19).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI. DR. ZINK

Plaintiff argues that the ALJ erred in giving no weight to the opinion of plaintiff's treating cardiologist, Dr. Zink, while affording weight to the opinion of a non-examining state agency physician.

39

A treating physician's opinion does not automatically control, but it should be given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Cain v. Barnhart, 2006 WL 2661157 (8th Cir. (Mo.), September 18, 2006), quoting Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). However, a physician's medical source statement addresses the applicant's residual functional capacity to work, which is a determination the Commissioner must make. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). "A treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record." Cain v. Barnhart, supra; Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001); Social Security Ruling 96-2p, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions (July 2, 1996).

In this case, the ALJ clearly believed the opinion of Dr. Zink during 2003, an opinion with which Dr. DeCampodinico (the non-examining state agency physician) agreed. Dr. DeCampodinico testified that plaintiff was

probably disabled from February 2003 through February 2004 due to the severity of his heart condition, and the ALJ relied on that testimony in finding that plaintiff was disabled from the date of his heart attack through the end of February 2004.

Dr. Zink stated in March 2003 that due to the severity of plaintiff's ischemic heart disease and ventricular septal defect, "I would consider him rather disabled."  In June 2003, Dr. Zink wrote, "given the severity of his ischemic cardiomyopathy and limited chances of improvement given the large area of non-viable myocardium at the time of his bypass surgery, he would certainly qualify for cardiac disability given his current medical limitations."

On May 4, 2004, subsequent to the time the ALJ found that plaintiff was no longer disabled, Dr. Zink wrote that plaintiff continued to suffer from moderate to severe ischemic cardiomyopathy with ejection fraction of 30% and suffered from New York Heart Association Class II to Class III symptoms, which mean mild and market limitation in activity due to symptoms, even during less-than-ordinary activity.  He noted that there had been no change in plaintiff's clinical condition, and that plaintiff continued to qualify for disability from a cardiac standpoint due to

41

his heart failure, ischemic cardiomyopathy with reduced ejection fraction and limited chances of recovery.

In October 2004 -- eight months after the ALJ found that plaintiff was no longer disabled -- Dr. Zink wrote that plaintiff continued to suffer from moderate to severe ischemic cardiomyopathy with ejection fraction of 30% and suffered from New York Heart Association Class II to Class III symptoms, which mean mild and market limitation in activity due to symptoms, even during less-than-ordinary activity. He noted that there had been no change in plaintiff's clinical condition, and that plaintiff continued to qualify for disability from a cardiac standpoint due to his heart failure, ischemic cardiomyopathy with reduced ejection fraction and limited chances of recovery.

Therefore, the record clearly establishes that plaintiff's treating cardiologist found no improvement in plaintiff's condition after his heart attack, and that his condition was the same in October 2004 as it had been in the spring of 2003. Plaintiff suffered from dead heart muscle which would not come back to life, and as a result had an ejection fraction as low as the one set in the cardiac listing of impairments.

42

The ALJ relied heavily (in fact, almost exclusively) on a letter from Tom Link, M.D. (not a treating physician) to Dr. Zink repeating what Dr. Zink was supposed to have stated to Dr. Link; i.e., that plaintiff should be able to perform full time sedentary work by February 2004. However, even if Dr. Zink hoped in May 2003 that plaintiff would be able to perform full-time work by the following February, clearly his opinion changed over time. Dr. Zink continued to state for the next year and a half that plaintiff is not capable of working due to his heart damage and low ejection fraction, resulting in fatigue and shortness of breath and a serious preoccupation with his heart condition which detracts from his ability to concentrate.

The ALJ points to absolutely nothing in the record other than that May 2003 statement to support his decision that plaintiff was no longer disabled after the end of February 2004. By contrast, the record establishes without a doubt that plaintiff's cardiac condition did not improve after his release from the hospital in February 2003. The fact that plaintiff was not undergoing frequent treatment is irrelevant in this case, as plaintiff's treating physician stated over and over again that plaintiff's heart muscle died during his heart attack and nothing could repair that.

43

Although he had severe coronary artery disease in three vessels, he only underwent one bypass because the other two vessels had already died during the heart attack. The damage to the muscle of the heart, such as that sustained during plaintiff's heart attack or in cardiomyopathy, impairs the heart's ability to eject blood resulting in plaintiff's extremely reduced ejection fraction.

The ALJ's opinion lists the following reasons for discrediting the opinion of Dr. Zink (other than his opinion as given to Dr. Link that plaintiff should be able to return to work by February 2004):

> The medical evidence reflects that claimant had a heart attack in February 2003 and underwent coronary artery bypass surgery and saphenous vein graft to his right coronary artery and patch disclosure [sic] of his ventricular septal defect. After surgery, claimant was assessed with moderate to severe ischemic cardiomyopathy with an ejection fraction of approximately 30 percent and New York Heart Association Class II and III symptoms. M.H. Zink, M.D., Ph.D., completed a Cardiac Residual Functional Capacity form on February 17, 2003, indicating that claimant could only sit for 3 hours in an 8 hour day and stand and/or walk for 1 hour in an 8 hour work day. However, Dr. Zink opined on May 22, 2003, that claimant would be capable of full-time sedentary work by February 2004.

(Tr. at 16).

I note here that the ALJ mistakenly refers to the Cardiac Residual Functional Capacity form as having been completed in February 2003, i.e., BEFORE the May 2003

44

opinion that plaintiff should be able to return to work by
February 2004. However, as explained above in footnote 16,
this form refers to an examination having been conducted on
June 24, 2003; therefore, the form had to have been
completed after June 24, 2003, and also AFTER the May 2003
opinion that plaintiff should be able to return to work by
February 2004. It is clear that by the following month, Dr.
Zink's opinion had changed as to plaintiff's ability to
return to work.

    The ALJ went on:

    The undersigned has considered the opinions of the
    treating and examining physicians of record. The
    undersigned gives no weight to the opinions of
    disability by Dr. Zink given in Exhibits 4F, 9F and
    12F. These opinions are inconsistent with his own
    opinion that he could perform sedentary work by
    February 2004.

(Tr. at 16).

    Again, the ALJ relies solely on the letter from Dr.
Link to Dr. Zink to discredit all of Dr. Zink's opinions for
the next year and a half, and this is despite the fact that
Dr. Zink's examination of plaintiff the end of June 2003
(AFTER his statement that plaintiff should be able to return
to work by February 2004) supports his continued opinion
that plaintiff is disabled from his cardiac condition.

45

In reaching a conclusion regarding whether claimant is disabled, the undersigned has considered the assessment made by the State agency physician regarding claimant's ability to perform basic work activities in accordance with Social Security Ruling 96-6p. Because this assessment is supported by the overall record after March 2004, the undersigned gives the State agency physician's opinion some weight.

(Tr. at 16-17).

Curiously, the only record after March 2004 is Dr. Zink's opinion that plaintiff continues to be disabled because his cardiac condition had not improved since he was released from the hospital after his heart attack in February 2003. Therefore, I am unclear as to what record after March 2004 is consistent with the opinion of the non-examining state agency physician on whose opinion the ALJ relied, when the ONLY record during that time frame is the record of Dr. Zink which the ALJ discredited.

During the year and a half when Dr. Zink responded to requests from SSA for opinions as to plaintiff's abilities, he appeared to struggle with estimates as to how long plaintiff could sit or stand or walk, etc. However, a physician's medical source statement addresses the applicant's residual functional capacity to work, which is a determination the Commissioner must make. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Furthermore, a

46

treating physician's checkmarks on a medical source
statement form are conclusory opinions.

The important part of Dr. Zink's opinions from early
2003 through the end of 2004 is his opinion that plaintiff
is disabled from his cardiac impairment because (1) he
suffers from moderate to severe ischemic cardiomyopathy with
an ejection fraction of only 30%, (2) in February 2003
plaintiff had severe three-vessel disease and a ventricular
septal defect, (3) only one of the three vessels was
repaired because the other two already contained dead cells
and could not be repaired, (4) the ventricular septal defect
was repaired but the anterior wall of the heart was damaged
and could not be repaired, (5) the anterior wall of the
heart continues to be non-viable (i.e., dead), and will
never get any better, (6) he continues to have an ejection
fraction of only 30%, (7) he continues to experience New
York Heart Association Class II to Class III symptoms
meaning marked limitation in activity due to symptoms, even
during less-than-ordinary activity; comfortable only at
rest, and (8) plaintiff's prognoses for <u>life</u> is good;
however, his chances of <u>recovering</u> beyond where he was

during 2003 and 2004 is extremely limited[20].

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff was disabled from February 9, 2003, through February 28, 2004; however, the substantial evidence in the record does not support the ALJ's finding that on March 1, 2004, plaintiff's disability ended. Rather, the substantial evidence in the record as a whole establishes that plaintiff's cardiac condition was the same after March 1, 2004, as it was during his period of disability in 2003.

## VII. CONCLUSIONS

Based on all of the above, I find that the ALJ erred in failing to give controlling weight to the opinion of plaintiff's treating cardiologist, and that the substantial evidence in the record as a whole does not support the ALJ's opinion that plaintiff's disability ended on March 1, 2004. Therefore, it is

---

[20]Because there is no medical evidence that plaintiff's continued smoking is the cause of the non-viability of his heart muscle and that cessation of smoking would end his disability, his smoking will not preclude an award of benefits. It appears that plaintiff's smoking will merely hasten his death, and he has been adequately warned by his doctors to stop smoking.

48

ORDERED that plaintiff's motion for summary judgment is granted.  It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.


_/s/ Robert E. Larsen_

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 21, 2006